Syllabus.

# IN THE MATTER OF THE GUARDIANSHIP OF DAVID K. TRASK AND ARTHUR K. TRASK, MINORS.

## No. 1448.

APPEAL FROM CIRCUIT JUDGE FIRST CIRCUIT.
HON. J. R. DESHA, JUDGE.

SUBMITTED JUNE 20, 1923.                    DECIDED AUGUST 14, 1923.

PETERS, C. J., PERRY AND LINDSAY, JJ.

GUARDIAN AND WARD—*attorney's fees.*

Where a guardian who is an attorney performs services for his ward of a purely legal nature and not such as might be performed by a layman, he is entitled to reasonable attorney's fees for such service.

SAME.

Where the estates of the wards had been incorrectly assessed for taxation and insufficient exemptions allowed, a guardian who is an attorney is not entitled to an attorney's fee for drawing the attention of the tax authorities to these facts and in obtaining a proper assessment of his wards' estate, it being the plain duty of the guardian to pay the proper amount of taxes due by his wards.

SAME.

A charge for attorney's fees by a guardian who is a lawyer for services re the widening of a street in front of his wards' property held under the circumstances herein not to be warranted.

SAME—*investment of wards' funds.*

P who was guardian of two minors loaned money to certain parties upon two mortgages on real estate, taking such mortgages in the name of P, "trustee". The money loaned belonged partly to P or clients of P and partly to the minor wards. One of said mortgages was never recorded and the other was not placed of record for several months after its execution. No declaration of trust indicating the interest of the minors in said mortgages was made by the guardian. Held, that the guardian was inexcusably negligent in failing to record the mortgages and in failing to properly show that he held these mortgages in trust for his

minor wards to the extent of their contributions towards the mortgage loans.

SAME—*annual accounts—duty of guardian to file.*

Guardians are required by Act 101, S. L. 1915, to annually file their accounts.

SAME—*failure to file account within proper time—commissions.*

The guardian filed his first annual account about seven months late and then only because of the insistence of persons acting on behalf of the minor wards. Held, the conduct of the guardian in failing to file his account, coupled with the manner in which he has handled the affairs of his wards, is such as to require that he be not allowed the commissions customarily allowed to guardians for the faithful performance of their duties.

SAME—*removal of guardian.*

Guardian is entitled, under Sec. 3042, R. L. 1915, to notice on question of his removal.

OPINION OF THE COURT BY LINDSAY, J.

This is an appeal from an order of the circuit judge, presiding over the division of domestic relations of the first circuit court, approving the account of C. F. Peterson, guardian of the persons and estates of the above named minors.

From the record sent up, it appears that prior to the appointment of the present guardian one T. P. Harris had been appointed guardian of the minors but had never qualified as such. The appointment of the present guardian, who is an attorney at law, on October 7, 1920, was upon the petition of said T. P. Harris. The guardian having filed no annual account, the father of the minors on May 12, 1922, filed with the circuit judge a motion that the guardian be ordered to file his account. On May 18, 1922, the guardian filed his first account covering the period from October 7, 1920, to October 25, 1921. Upon the petition of the father of the minors a "next friend" of the minors was appointed who filed objections to the guardian's account. Because of these objections the circuit judge referred the account to a master for examina-

tion.  Before the master had filed his report on the first account the guardian filed a supplemental account covering the period from October 25, 1921, to June 19, 1922, and the report of the master thereafter filed embraced both of these accounts.

The master in his report recommended that the guardian be surcharged with several charges made by him against the minors' estate.  Upon exceptions taken by the guardian to the master's report a hearing was had and evidence taken, after which the circuit judge disregarded the recommendation of the master and made an order approving the account of the guardian in toto, from which order the next friend of the minors has perfected this appeal.

The first item in the account objected to by the next friend, is a charge of $25 made by the guardian for his services as an attorney rendered to one of the minors.

It appears from the evidence that Arthur Trask, one of the minors, had been arrested at the instigation of one Mokumaia and held at the police station.  No formal charge against the minor being laid, he was, after about twenty-three hours detention, released.  The minor consulted his guardian upon the advisability of bringing an action for false imprisonment against Mokumaia and for that purpose went several times to the office of the guardian, on one or more of these occasions being accompanied by his father and on another by his aunt, Mrs. Sallie Trask Erickson, who is the next friend of the minors in this proceeding.

The guardian made inquiry at the police station as to the cause of the arrest.  He also consulted the records of the tax department and registrar's office with the view of ascertaining what property Mokumaia had, after which he informed the minor that, although the minor had a good cause of action, there was no use of suing Mokumaia

because he had no property with which to satisfy any judgment that might be recovered against him. The guardian further stated to the minor that if he wished to go ahead with the action for false imprisonment he would require a retainer of $100 besides a deposit for costs of court, and that the minor must bring in this money as the guardian would not take it from the minor's estate. The minor testified that the guardian told him that he could not take this case himself and would have to engage an outside attorney to do so. The matter of bringing suit against Mokumaia was dropped, the guardian hearing nothing further from the minor or his relatives in regard thereto. On behalf of the minors it is contended that the minor merely consulted with Mr. Peterson because he was his guardian, not as an attorney, and that when the minor discovered that the bringing of a suit against Mokumaia would be so expensive the matter was dropped. The guardian admits that he never asked the minor or his relatives for a fee for these services but states that he simply put the charge of $25 in the account.

The master, in reporting on this charge of $25, found that the services rendered were of a purely legal nature and that the guardian was therefore entitled to make a charge for the same. From the evidence we cannot say that the services performed by Mr. Peterson in this matter were such as could be expected from a guardian. It may be true that the minor believed that he had a right to consult with his guardian on such a matter as this without being required to pay an attorney's fee, nevertheless, the question as to whether a person has or has not a right of action against another person is one that cannot usually be answered by a layman, and in this case the guardian was perhaps, strictly speaking, authorized to make a reasonable charge for his services. It might be remarked, however, that had the guardian earlier in-

formed his ward or the ward's relatives that he was making this charge and not left them in ignorance of the same until many months later when he included it in his supplemental account, the propriety of making such a charge might perhaps not have been seriously objected to.

The next charge objected to is a charge of $10 made by the guardian against the estate of his wards under date of June 15, 1922, for "services, adjustment old taxes 1920." The master recommended that the guardian be surcharged with this item.

In explanation of this charge the guardian testified that certain taxes against his wards' estate had become delinquent before he became guardian, that his predecessor had not attended to the payment thereof, and that the present guardian did not know about these delinquent taxes until the matter was called to his attention after the institution of these present proceedings. After the matter was thus called to his attention, the guardian, according to his testimony, "made a very good settlement on behalf of the minors" with the tax authorities. The guardian further testified in regard to this charge for adjusting these taxes as follows: "shortly after this matter was brought up in May I was informed by the father when I went to see him about the road deal with the government that he was very sore because I had not paid the taxes on the land. He said they were delinquent. I then looked up the records in the tax office to see if there was any taxes due and found that there were taxes due before my time, but which had nothing to do with the minors estate. * * * And were then delinquent. I found that the government had taxed these minors on the land with penalties amounting to about forty-three dollars and a half for a period which was before my time. I found also that they had taxes against the mother for the years 1918 and 1919 which, of course, I had nothing to do with.

I took the matter up with the tax department and told them that their assessment was wrong. I told them that they had not assessed the minors separately as should have been done and had not allowed lawful exemptions to the minors which they should have allowed and in that way I got the tax department to come over and look up the probate records, showed them my appointment as guardian, and got them to wipe out the old assessment and got them to make a new assessment in which they allowed the minors each a three hundred dollar exemption which they did not allow before and which practically made the minors' interest amount to nothing. That is, the value—when off-set by the exemptions—made the taxes amount to almost nothing. There was an adjoining piece which was under lease as a store and on that the penalty was charged against the tenant. I took the matter up with the government and got them to assess the minors' interests separately and the amount of the tax was not more than the tenant was obliged to pay, so I collected that from the tenant and paid it and in that way saved the minors any penalties and interest. Saved the estate, I have the figures here. I think I got the minors taxes assessed at seven dollars and fifty-five cents apiece for the year, all of which was taken from the tenant, the exemption for the minors making their own interest in the property nominal or nothing. In that way I saved the entire forty-three and a half for the minors. Nothing came out of their pockets at all and they were saved that much by reason of this service and the legal knowledge,— that is, knowing how to go at it where a layman would have had to hire an attorney."

It is contended on behalf of the guardian that for his services as above outlined in settling the delinquent taxes of his wards' estate he is entitled to an attorney's fee. In other words, the contention of the guardian is that the

services performed by him in respect to these delinquent taxes were not such services as might have been expected to be performed by a layman but were of such a nature as to require the peculiar skill and knowledge of a lawyer.

In many jurisdictions a guardian who is a lawyer by profession is not allowed to charge attorney's fees for services rendered to his ward. This is upon the theory that it would be a dangerous practice to allow a guardian to create work and fees for himself at the expense of his ward's estate. There is much to be said in favor of such a rule but, be that as it may, it has long been the rule in this jurisdiction to allow to attorneys who are guardians or administrators, in proper cases, reasonable attorney's fees for professional services rendered for the benefit of the ward. See *Guardianship R. P. Humeku,* 15 Haw. 394; *Estate of Kalua Kapukini,* 14 Haw. 204; *Magoon* v. *Brash, et al.,* 11 Haw. 204. *In the Matter of the Estate of Hiram Maikai,* 3 Haw. 522, this court said: "The court would allow professional charges for services rendered to the estate in all cases where such services are necessary; and would allow them to the administrator if he should be a lawyer, whensoever they would allow them to an administrator who is not a lawyer. With regard to such allowances every case must stand by itself and no fixed and invariable rule can be laid down."

One of the chief duties of a guardian is to settle accounts in favor of and against the estate of his wards and in the case at bar it was clearly the duty of the guardian to pay all taxes legally assessed against the estate of his wards. It is a matter of common knowledge that by far the greater majority of persons pay and settle their taxes without seeking legal advice. It is also a matter of common knowledge that persons are entitled to certain exemptions and deductions from taxation. While

ordinarily the guardian of a minor's estate is not presumed to be a person versed in technical law, he is expected to be a person of ordinary prudence and understanding, and the law requires that, in acting on behalf of his ward, he will use the same care and precaution that a prudent man would ordinarily use in attending to his own affairs. In the present case, had the guardian not been a lawyer, when he became aware of the fact that his wards' estate was charged with taxes it is unlikely that he would have deemed it necessary to employ legal counsel to ascertain whether these taxes were legally assessed. Under such circumstances it would have been his clear duty to have inquired from the tax authorities what these taxes were for, and to have ascertained whether the proper exemptions and deductions had been made therefrom. Such inquiry would inevitably have called the attention of the tax authorities to the fact that the taxes had not been legally assessed nor proper exemptions allowed, and it is to be assumed that a correction in that respect would have been made. The duty of an administrator or guardian with respect to the payment of taxes is in no respect different from his duties regarding other claims against an estate, and in all such cases the administrator or guardian before paying such claim, must satisfy himself that the claim is not only a just one but that it is properly computed. It might perhaps happen in some cases that a guardian in settling a claim against his ward's estate might pay a larger amount than was legally due, but that is one of the risks of the guardian's position. To say in the present case that because the guardian did not pay an excessive claim but succeeded in convincing the claimant that his claim was excessive he should be paid extra compensation is on the face of it absurd. It being the plain duty of the guardian to pay the proper amount of taxes due by his wards, it was error on the part of the

circuit judge to allow him a fee for merely performing such duty.

The ruling of the circuit court is reversed and the guardian is surcharged with the sum of $10.

The supplemental account of the guardian under the date of June 10, 1922, contains a charge against the minors of $50, "services to date re change of road Moanalua". This charge is resisted by the next friend. In recommending that this charge be not allowed, the master in his report said: "In explanation thereof the Master says that the City and County of Honolulu has lately widened the junction of the Puuloa and Honolulu-Schofield roads in such a manner as to leave a small strip of land just in front of a portion of the minors' realty. This strip is worth, at a conservative estimate, $20.00. The Guardian has assessed a fee for advice given in connection with the acquisition by the wards of the strip and other legal services relating thereto of $50.00. This is properly the Guardian's duty in any event and the Master therefore recommends a surcharge in that regard." The circuit judge did not, however, adopt this recommendation of the master but allowed the charge without comment.

It appears from the inventory filed with the supplemental account of the guardian that the only real property owned by the minors is a piece of land at Moanalua, the area of which is 10,360 square feet, the value of which is not stated. On a portion of this land is a grocery store which yields a rental of $15 per month. The home of the minors adjoins this store. It is contended by the guardian that the service performed by him in regard to the widening of the road in front of this property "was of a legal nature and one that could not have been performed by a layman; that it involved examination of the title and of the statutes with reference to the right of the Government to take land for road purposes and of the rights of

abutting owners to acquire abandoned roadways; the preparation of various petitions and finally the filing of a petition in court to authorize the guardian to acquire the abandoned roadway in order to prevent great loss to the rest of the wards' property; that the money compensation required by the Government for the strip in question should not be the basis upon which to figure the value of the service rendered; the importance of the strip to the rest of the property and the necessity for acquiring it should be the first consideration coupled with the nature of the service and the necessity therefor and whether the same could have been performed by a layman guardian."

In support of his contention that he was justified in making this charge of $50 the guardian testified that the matter of widening the road at Moanalua had been "hanging fire for over a year". The government had been trying to get the road straightened and widened. The attorneys of the Damon estate which owned adjacent property discussed the matter several times with the guardian and the guardian "took the matter up" with the county attorney's department. The government's original plan was to move the road mauka of the minors' land so that they would have been shut off from the new road. This would have taken some of the minors' property. Then the government changed that plan and was going to put the road makai instead of mauka. This would have taken away the minors' frontage to the road. "That was tentatively agreed to. The attorneys were to apply to this court to purchase this land the government would need for the new road and the minors were to exchange with the Damon Trustees for another piece by which we were to give Mr. Damon an equal area in the back somewhere for the frontage that they were going to get." According to the guardian, he drew up a petition to the court to make this exchange. This petition, however, was

never filed, for the government authorities agreed to sell the minors the frontage that would result after the location of the road was changed. The guardian then filed with the circuit court a petition for leave to purchase from the Territory this abandoned strip. At the time of the hearing of the objections to the guardian's account this petition had not been acted upon by the circuit court.

It seems incredible to us that the guardian should insist that for his services in this matter he should be paid $50 or any other sum. The only work that savors of a legal nature in the whole transaction was the drawing up and filing of a petition, which on the face of it was unnecessary. This petition was filed on June 20, 1922, while the accounts of the guardian were being investigated. From the petition it appears that the government was willing to convey to the minors the abandoned strip in question containing an area of 233 square feet *for the pitiful sum of $8*. The guardian must have been aware that he required no leave of court to make this petty purchase and that it was his plain duty to accept from the Territory a deed for the abandoned strip. In our opinion the conduct of the guardian in attempting to charge his client with a fee of $50 for his services in this matter is most reprehensible and it is difficult to understand why the circuit judge should have ignored the master's recommendation and sanctioned such exploitation of the minors' estate. The guardian's trust is one of obligation and duty and not of speculation and profit, and the courts treat with suspicion all acts and circumstances evincing a disposition on the guardian's part to derive undue advantage from the position he occupies. Charges for services claimed to have been rendered by a guardian for his ward's estate for which extra compensation is claimed should always be closely scrutinized, for in such cases there is too much opportunity and danger for abuse

of the position held by the guardian. One of the chief, if not the chief, duties of a guardian is to protect, preserve and manage his ward's property to the best advantage of the ward. While it is true that in this jurisdiction a guardian who is an attorney by profession is, under certain circumstances, allowed fees for professional work done for the benefit of his ward's estate, before such fees may be allowed it should clearly appear not only that the charge made is a reasonable one, but that the services rendered were purely of a legal nature and that they were necessary, and the burden of proving these facts is upon the guardian. In cases where it is doubtful whether the services rendered by a guardian who is an attorney are of such a nature as to require the expert knowledge and services of an attorney, that doubt should be resolved in favor of the minors and against the guardian. Fair dealing demands nothing less. As was well remarked by the late Mr. Justice Galbraith in the matter of the *Guardianship of Humeku,* 15 Haw. 394, at page 399: "It was never contemplated that the office of guardian should be one of great profit or that it should be sought on account of its emoluments. The position of guardian is not thrust upon one against his will. It is usually sought for. Philanthropy and not avarice is supposed to be the motive that should prompt one to seek the place." In attempting to make this charge the guardian has not acted towards the interests of his wards with such fairness, frankness and entire good faith as should characterize every action of a guardian in dealing with the affairs of his ward.

Excerpts from the following cases show how this court in times past has frowned upon conduct similar to that of the guardian in the present case.

"The practice of regarding estates coming before courts for review or settlement to be the legitimate prey of all who come in contact therewith should never for one

moment be tolerated in this Territory." *Notley* v. *Brown,* 16 Haw. 575, 579.

"We are unable to escape the conclusion that the chief object of the administration proceedings in this estate has been the accumulation of attorneys' fees." *Estate of Kamaipiialii,* 19 Haw. 163, 166.

"Upon all possible occasions this court has endeavored to give notice that it will not tolerate the practice of treating estates of deceased persons as fair game for the incurring of unnecessary or excessive legal expenditures." *Ibid.* p. 166.

The guardian is surcharged with this item of $50.

Another criticism of the guardian's actions reported by the master and passed unnoticed by the circuit judge is the manner in which the guardian has invested the funds of his wards' estate. It is the contention of the next friend that the lands on which the guardian holds a mortgage are not of sufficient value as security for the loan made by the guardian. It is furthermore contended that the guardian has mingled his wards' funds with funds of his own or of other clients.

According to the first annual account of the guardian, the guardian had loaned to W. K. Yuen $900 of the minors' funds on a mortgage of a piece of land in Honolulu, also $150 to Sarah N. Kali on a mortgage of a piece of land in Kohala. This latter mortgage was never placed of record, neither has the guardian offered any satisfactory explanation as to why funds of his wards should have been invested in a mortgage that had not been recorded from the date of its execution on October 25, 1920, up to the filing of the first annual account. In the objections of the next friend to the first annual account it was also set forth that the mortgage to W. K. Yuen to secure a loan of $900 was not placed of record until five months after its execution. The guardian has given no explanation as

to why this mortgage was also left unrecorded for such a long period.

As to the loan to W. K. Yuen, the land upon which this loan was made consists of a parcel of land about 200 x 100 feet in area, and was used by a Chinese as a vegetable garden. It was assessed for taxation purposes at $915. According to the guardian, this land had originally belonged to a man named Harbottle with whom Mr. Peterson had business relations. Through the activities of Mr. Peterson, this land was conveyed to W. K. Yuen with whom Mr. Peterson also appears to have had intimate relations in the matter of buying and selling real estate. At the hearing before the circuit judge both Mr. Peterson and Yuen, the grantee of the land, testified that they could not remember the price paid by Yuen to Harbottle for the land, but, as appears by the deed as recorded, the purchase price was $600. On October 14, 1920, W. K. Yuen conveyed this land to C. F. Peterson, "Trustee", by way of mortgage, to secure a loan of $2500. Yuen in testifying at the hearing, said that he remembered signing such a mortgage but did not remember the amount thereof,—that he left all of such matters to Mr. Peterson. The guardian's testimony was to the effect that at the time he made this loan and took this mortgage he had in hand $900 belonging to the minors; that investments of such small sums are frequently difficult to secure, and that he therefore put this sum of $900 into the Yuen mortgage, the balance of the mortgage loan being made up from funds belonging to other clients of the guardian. As already stated, this mortgage was taken in the name of C. F. Peterson, "Trustee". No declaration of trust concerning the interest that the minors had in this mortgage was made or placed of record by the guardian. The first annual account indicated that $900 of the minors' money had been invested in a loan to Yuen, secured by mortgage

upon real estate, but that account in no way indicated that the mortgage mentioned was not for the sum of $900 but was for the sum of $2500. Neither did said account indicate that the mortgage had not been taken in the name of Mr. Peterson as guardian, but in the name of Mr. Peterson as "Trustee". After the next friend had filed objections to the first account, which objections led to the said account's being referred to a master for examination, the guardian on June 20, 1922, filed a supplemental account by which it appeared that both the Kali loan of $150 and the Yuen loan of $900 had been repaid to the guardian, and that $150 had been loaned to one Edward Jesus on May 21, 1922, and $900 to Wong Sut, et al., on May 21, 1922. The amount of the loan to Edward Jesus was $200, of which $150 belonged to the minors. The amount of the loan to Wong Sut was $2000, of which $900 belonged to the minors. As on the former occasion, both of these mortgages were taken in the name of C. F. Peterson, "Trustee", but on June 21st Mr. Peterson placed of record declarations of trust reciting that he held these two mortgages as trustee for the Trask minors to the extent of $150 and $900 respectively. The guardian at the hearing testified that he had made and placed of record these declarations of trust because the master had intimated the wisdom of such action. The guardian also testified at the hearing that Yuen had recently conveyed the mortgaged land to Wong Sut, et al., for $3000, of which amount Wong Sut had paid $1000 down and had given a mortgage to C. F. Peterson, "Trustee", for the balance of $2000, and that the $900 of the minors' money is invested in this mortgage. This mortgage is therefore on the same land as was the mortgage to Yuen.

As to whether this land is of sufficient value to warrant a loan of $2000 it is difficult from the evidence to say. Although, as has been already stated, the land is

only used as a vegetable garden and was purchased a few years ago by Yuen for $600, and at the date of the guardian's first account was taxed at only $915, both the guardian and a real estate dealer testified that the property was suitable for residence purposes and was of such a value as to justify a loan thereon of $2000. The fact also that Yuen was able to secure a purchaser for $3000 would indicate that it was worth in the neighborhood of that sum. Assuming that to be a fair value of the land and that the title to the same was unquestioned, it would seem doubtful whether an ordinary, prudent banking concern would lend $2000 or two-thirds of its cash value upon such security. Be that as it may, and assuming that the interests of the minors are now sufficiently secured by this loan, in our judgment the actions of the guardian in respect to the investment of his wards' funds in the manner above indicated are open to severe censure. In the first place, the failure of the guardian to ever place of record the mortgage to Sarah Kali and his failure to record the Yuen mortgage for five months after its execution was inexcusable. As the guardian must be well aware, had Sarah Kali or Yuen conveyed or mortgaged their holdings to innocent takers and such conveyances or mortgages had been placed of record, these prior unrecorded mortgages would have utterly failed to secure the loans made on behalf of the minors. But even more reprehensible than the failure of the guardian to record the mortgages was the manner in which he took title to said mortgages. As already stated, Mr. Peterson took these mortgages in the name of C. F. Peterson, "Trustee", making no declaration of trust as to the minors' interest. Up to the date of the filing of his first annual account it nowhere appeared where or how the funds of the minors were invested. Had Mr. Peterson died during that period or become insane it is obvious that it would have been difficult to trace or

prove where the funds of the minors lay.  Mr. Peterson
seeks to justify his conduct in this respect by saying that
many trust companies and others holding trust funds fre-
quently invest such funds in the manner followed by the
guardian in this case.  We are not informed as to such a
custom, but if such a custom does exist, it is a most
pernicious one and not to be tolerated by the courts hav-
ing supervision over trust estates.

The failure of the guardian to file his account in due
season.  Although the guardian was appointed on Octo-
ber 7, 1920, he filed no account until May 18, 1922, some
seven months after the time on which by law it should
have been filed, and then only because of the activities of
the attorney of the next friend of the minors.  It appears
from the affidavit of H. T. Mills, the attorney for the next
friend, that he on April 5, 1922, in writing requested the
guardian to file his account and that after said date Mr.
Mills several times requested the guardian to file his
account.  This is not denied by the guardian.  The only
excuse given by the guardian for his delinquency in filing
his account in due season was that "the matter simply
slipped me.  I didn't realize the year had gone by until
Mr. Mills had called my attention to it."  The guardian
further testified that after Mr. Mills called his attention
to the matter he had been so busy that he had not been
able to attend to it.  Counsel for the guardian argues that
the failure to file the account at the proper time was pure
inadvertence on the part of the guardian and that inas-
much as no harm has resulted to the estate of the minors
by reason of the delay in filing the account, no penalty
should be visited upon the guardian for such delay.
With this contention we cannot agree.  Had the guardian
voluntarily filed his account when he did, albeit some
seven months late, it might perhaps be said that such
delay was a matter of mere inadvertence for which the

guardian should be excused. Neither is it obvious under the circumstances that no harm has resulted to the estate of the minors by reason of the neglect of duty of the guardian. It abundantly appears by the record in this case that the neglect of the guardian to file his account at the proper time engendered such suspicions and misgivings on the part of the minors and their relations that they felt constrained to engage counsel to demand that their guardian should give account of his stewardship and it is a reasonable assumption that had it not been for the efforts of Mr. Mills the filing of the account of the guardian might have been delayed for a much longer period. The minors were entitled to be kept informed of the condition of their small estate and they were harmed in being kept in ignorance thereof. Furthermore, while it may be that the guardian was excusable for not filing his account before his attention was called to the matter by Mr. Mills, his neglect to immediately thereafter file his account cannot be brushed aside by the mere statement that he was too busy, for an examination of the account itself shows the weakness of such an excuse. The guardian's account as first filed shows that the receipts of the minors' estate consisted of but six items, two of which are for cash received from the former guardian and the proceeds of the sale of the wards' real estate, and four of such items are receipts of interest due the estate. The number of disbursements noted in the first account are so few that we copy them in full:

Oct. 14, 1920, Loan W. K. Yuen on real estate mortgage, 8%..........$900.00

Oct. 25, 1920, Loan Sarah N. Kali on real estate mortgage, 8%......... 150.00

Guardian's commissions:

    $2\frac{1}{2}$% on $1056.90 (principal) at inception of trust, .................. 26.42

10% on $84.00 (income)................  8.40
June 27, 1921, Cash paid for steamer fare
   (Arthur Trask) ....................  15.00

In other words, the entire account consisted of six items of receipt and five items of disbursement, the making up and filing of which could have occupied but a few moments of the guardian's time, and yet the guardian's only excuse for his neglect to file such account when thereto rightfully requested was that he was too busy. Had these accounts been filed in proper season the unbusinesslike and unwarranted manner in which the guardian had performed his duties as guardian would have sooner been discovered and remedied. Guardians are allowed commissions for the faithful performance of their duties. In the case at bar we are of the opinion that the guardian has been so neglectful of his duties as not to be entitled to the commissions usually allowed to guardians and he is surcharged with all of the commissions charged in his account.

One of the errors assigned by the appellant is that the circuit judge erred in continuing Mr. Peterson as guardian.

In her objections to the supplemental account of the guardian the next friend said that she "upon a hearing of the matters and things now before this Honorable Court in reference to the acts and doings of said guardian, will move for the discharge of said guardian from his appointment as such." Such motion does not, however, appear to have ever been made. In the opening brief on behalf of appellant the removal of the guardian is not urged, consequently the brief of the guardian is also silent in that respect. In her reply brief the next friend briefly urged that the conduct of the guardian as shown by the evidence and the record had been such as to call for his removal.

Reprehensible as we feel that the conduct of the guard-

Syllabus.

ian has been in handling the affairs of his wards, in the absence of a motion for his removal and notice to the guardian, this court cannot now pass upon that question. Section 3042, R. L. 1915, provides for the removal of guardians who have proved unsuitable, but such removal may be only after notice to the guardian, and in the case at bar it does not appear that the notice contemplated by the statute has been given the guardian.

A decree surcharging the guardian for the items mentioned in the foregoing opinion will be signed upon presentation.

*H. T. Mills* for appellants.

*Robertson & Castle* for appellee.

