## IN THE MATTER OF THE TRUST CREATED BY DECLARATION OF TRUST OF WILLIAM McBURNEY DEAN, DATED NOVEMBER 14, 1944, AND SUBSEQUENTLY AMENDED.

No. 4252.

July 7, 1964.

TSUKIYAMA, C.J., CASSIDY, WIRTZ, LEWIS, JJ., AND CIRCUIT JUDGE JAMIESON, IN PLACE OF MIZUHA, J., DISQUALIFIED.

630

OPINION OF THE COURT BY LEWIS, J.

Appellants are the administrator with the will annexed of the estate of William McBurney Dean, who died September 14, 1959; and the widow of the decedent. Mr. Dean founded the Dowsett Highlands Land Trust, a business trust, by a declaration of trust dated November 14, 1944, and at the times here involved was the sole trustee of the Land Trust. He hereinafter sometimes is referred to as the "Trustee."

This case originated as a petition for appointment of successor trustees, filed January 19, 1960. However, the case has evolved in such manner as to involve all the af-

fairs of the trust, including the ownership of the trust shares. Meanwhile, temporary trustees have been in charge, and there has been no particular difficulty on that score.

The petition was filed by Hawaii Builders Supply Company, Limited, which alleged that it held twelve out of the sixteen trust shares. These twelve shares were purchased in 1957 from the then owners of the shares by Joseph Haley, an employee of Hawaii Builders Supply, acting for the Trustee and his wife as undisclosed principals. Hawaii Builders Supply at no time has claimed the beneficial interest in these twelve shares and has held them "as Trustee." While it has claimed the right to recoup certain sums, it has recognized that upon recoupment the shares were to be transferred to the Trustee and his wife.[1]

Hawaii Builders Supply now has recouped or released all sums claimed by it, which leaves the contest as to stock ownership one between Wong Koon Chuck, owner of two shares, and his daughter Mrs. Leatrice Wong Chock, owner of one share, who claim the twelve shares for the Land Trust, and the Trustee's estate and his widow who claim that the twelve shares belong to the Trustee's estate[2] and that the widow, as surviving tenant by the entirety, owns one share of the Land Trust. A judgment having been entered imposing a constructive trust on the twelve shares in favor of the Land Trust and making other provisions hereinafter reviewed, the Trustee's administrator and his widow appealed.

---

[1] According to a letter of October 23, 1957, the transfer was to be made to the Trustee and his wife as tenants by the entirety.

[2] This was the claim set forth in appellants' answer. However, it was stipulated and found that the twelve shares were purchased for the Trustee and his wife as undisclosed principals, and as appears from note 1, upon recoupment of certain sums by Hawaii Builders the twelve shares were to be transferred to the Trustee and his wife as tenants by the entirety.

As to the one share claimed by the widow, it is undisputed that this share (which, with the twelve shares in contest and the three shares owned by Wong Koon Chuck and Mrs. Leatrice Wong Chock, makes up the total of sixteen shares) is owned either by the Trustee's widow or by his estate. We will have occasion hereafter to consider further the ownership of this one share.

There was evidence that the shareholders who owned the twelve shares before the 1957 sale had lost confidence in the Trustee. Though the land holdings of the business trust had not been fully developed and additional capital was needed, these shareholders did not want to contribute more. Mrs. Ing, owner of four of the twelve shares, testified that she suggested to the Trustee that money be borrowed but "he didn't know whether he could or not." The holders of the twelve shares got together to sell their shares. The wife of Wong Koon Chuck (mother of Mrs. Leatrice Wong Chock) offered $7,500 per share but offered no earnest money.[3] The holders of the twelve shares wanted $9,000 per share. Finally, Joseph Haley, acting as the sellers thought for Hawaii Builders Supply, offered $8,500 per share, and an option was signed at that figure on July 20, 1957.

The sum of $5,000 was paid for the option, and $55,000 was to be paid upon exercise of the option within ninety days. The balance of the $102,000 price was to be represented by "a promissory note for FORTY-TWO THOUSAND DOLLARS ($42,000.00), secured by assignment of all proceeds from said shares * * *."

The $5,000 option money was obtained from Avon Yap and George Matsuoka, who were appointed exclusive sales agents for the lots into which the land holdings of the trust

---

[3] There is no evidence that the Trustee sought to undercut Mrs. Wong Koon Chuck. On the contrary, there is testimony that he sought to help her.

were to be subdivided, on the understanding that they would advance this money to the Trustee to purchase shares in the Land Trust. Hawaii Builders Supply made the arrangements and received this money. It was to be repaid through Hawaii Builders Supply out of commissions which the Trustee would receive upon the sale of the lots. However, the source of payment was not necessarily limited to these commissions. As testified by Mr. Yap: "Well, I didn't—we didn't discuss whether all of them would be paid through trustee's commissions or not. I felt that with Hawaii Builders back of him, why, I wasn't going to worry actually too much about it."

Messrs. Yap and Matsuoka were to receive, in addition to their regular commissions, an override of 2% (1% for each) based on the sales price of all the lots, to be paid from the income from the twelve shares. This override was to be paid partly because of the loan of the $5,000 and partly because of work Messrs. Yap and Matsuoka were doing in getting the subdivision under way which was beyond their ordinary duties as sales agents.

Mr. Dean, individually, signed a note for the $5,000 option money on July 15, 1957, promising to pay it to Messrs. Yap and Matsuoka in two years with interest at 8%. At that time the arrangements with Hawaii Builders Supply were not in writing. Subsequently, two letters confirming the arrangements between Hawaii Builders Supply and the Trustee were signed by both. These letters were dated August 11, 1957 and October 23, 1957. We shall have occasion to review them hereafter. Suffice it to say at this point that we are satisfied the foundation had been laid earlier, before these letter agreements were signed, for Hawaii Builders to become a source of financing not only for the work of the Land Trust but also for the purchase of the twelve shares by the Trustee. It is a reasonable inference that it was agreed in July, 1957, at the time of

the arrangements with Messrs. Yap and Matsuoka and the taking of the option, that Hawaii Builders Supply would have control of the funds of the trust and the proceeds of the twelve shares. It further is a reasonable inference that it was understood from the start that Hawaii Builders would carry the purchase of the twelve shares if necessary. Indeed, it was not until 1958 that the Trustee made a bank application for a loan of $55,000 stating the purpose: "To repay Hawaii Builders Supply Company, Ltd., for advance to exercise option." This application was unsuccessful.

Appellants contend that Hawaii Builders Supply, not the Trustee, appointed the exclusive sales agents, and on that ground attack the trial court's finding that Avon Yap and George Matsuoka "had been appointed exclusive real estate sales agents for the land trust by Mr. Dean as trustee * * *," and the further finding that "Mr. Dean used his position as trustee to gain a personal advantage and to benefit personally by obtaining the $5,000 loan from persons who owed their position as exclusive sales agents for the land trust to the trustee and who, understandably would want to continue as such." Appellants contend in their brief that "the documentary evidence indicated that the exclusive sales agency was at the behest of Hawaii Builders,"[4] and that "The oral testimony does not contradict this but, rather, seems to offer corroboration." Upon review of the evidence we find no mistake of any consequence in the findings made. It is immaterial whether the appointment of the sales agents was made by Hawaii Builders or by the Trustee, since it was the Trustee's ar-

---

[4] The letter agreement of August 11, 1957 provided in paragraph 5 that in return for certain promises of assistance to the trust "Hawaii Builders Supply Company, Ltd., for its protection is authorized to designate the real estate broker who shall have the exclusive authorization to sell * * *." Immediately thereafter it was provided in paragraph 6: "In accordance with paragraph 5, Avon Yap and George Y. Matsuoka of Waikiki Realty, Limited, are hereby designated as exclusive sales agents."

rangements with Hawaii Builders which made it possible for that company in turn to make arrangements with the sales agents, which in turn were coupled with the making of the loan for the benefit of the Trustee. Mr. Yap testified that the Trustee entered into the discussions, and explained that the $5,000 "was to be loaned to him through Hawaii Builders and it would be refunded or returned to us by him through Hawaii Builders * * *." It was a three-party arrangement between the Trustee, Hawaii Builders Supply as the supplier of materials, and Messrs. Yap and Matsuoka as sales agents. It is immaterial that the trial court's findings did not spell out the connection between Hawaii Builders Supply and the sales agents.

The option was exercised October 14, 1957, which under the terms of the option called for payment of $55,000 at that time. This $55,000 was advanced by Hawaii Builders Supply. The trial court, after finding that "Mr. Dean as trustee had the power to and did appoint Hawaii Builders as exclusive materials supplier for all houses to be built on the subdivided lots of the land trust," further found: "It appears an inevitable conclusion that Hawaii Builders advanced the $55,000 on the strength (a) of Mr. Dean's position as trustee, (b) of the trust assets and credit and, (c) of the scheme of Mr. Dean to sell the eighteen lots to himself—not on Mr. Dean's personal merit as a borrower." We now examine these findings. This review will include the matter of the eighteen lots, not previously mentioned herein.

The letter agreement of August 11, 1957 was made with Mr. Dean as trustee, and the letter agreement of October 23, 1957, was made with him individually. The August letter confirmed an agreement whereby Hawaii Builders Supply would post a performance bond with the City and County and "render all assistance possible" to construct subdivision improvements; would supply "all materials

and supplies for construction of homes and improvements in said subdivision at contractor's prices"; would receive and disburse all moneys from the sale of lots; and would be protected by a mortgage on the land, subject to a previous mortgage if not released. The October letter confirmed an agreement with Mr. Dean personally relative to the purchase of the twelve shares, and provided "that all income earned by said shares shall first be applied to payment of all moneys due on the purchase price thereof, together with interest thereon."

When Hawaii Builders Supply advanced the $55,000 it showed on its books that this was a loan to the Land Trust. Moneys of Hawaii Builders Supply, and moneys received by it for the Land Trust or for Mr. Dean as proceeds of the twelve shares, were commingled in one bank account. It is contended, however, that the loan of the $55,000 was not made on the strength of the trust assets or credit. Further, it is pointed out that since payments made on the balance of the purchase price came out of the commingled back account the source of these further payments is not clear.

We accept the view that the price of the twelve shares, after the initial $5,000 payment, ultimately came out of and was intended to come out of the proceeds accruing to the twelve shares after their purchase. It still remains true that the Trustee used his position—his control of the trust's affairs—to obtain financing from Hawaii Builders Supply for his individual purchase of the twelve shares. Hawaii Builders Supply's profit was to come from the sale of materials and supplies for the development of the subdivision lots and the building of houses thereon. This business it received from the Trustee in his fiduciary capacity. While the trial court too strictly limited appellees in their proof as to the Trustee's personal finances, enough appears to show that his own credit would not have commanded

any of the loans or advances needed for purchase of the twelve shares. Though the twelve shares could be expected to pay for themselves out of the proceeds thereof there was no reason why anyone should make, for another's benefit, the advances necessary to bring this about, unless he too was to enjoy some benefit therefrom. Upon proper analysis it appears that the sales agents and building supply company financed this purchase for the Trustee in order to advance their own business with the Land Trust.

We come now to the matter of the eighteen lots. These eighteen lots, out of twenty-four lots developed as the next phase of the Land Trust's project, or three-fourths of the twenty-four lots, were allocated or attempted to be allocated to the twelve shares purchased by the Trustee, being three-fourths of the total shares, in an endeavor to cause the profits from these lots to be an individual realization of the holder of these shares instead of a realization of the Land Trust. Appellants contend that this transaction was merely a tax avoidance scheme, and we shall so regard it. Since, however, we affirm the constructive trust imposed on the twelve shares as hereinafter set out, this in itself is sufficient to call for like treatment of the proceeds of the eighteen lots allocated, or attempted to be allocated, to the twelve shares.

The material point is that the twelve shares had a potential sufficient to cause, and which under the court's findings did cause, Hawaii Builders Supply to finance the Trustee's purchase of these shares on the strength of the return to be expected from the shares,[5] in order that

---

[5] The eighteen lots, each about 10,000 square feet in area, were transferred or attempted to be transferred from the Land Trust to the holder of the twelve shares for $130,058.00, or $0.72 per square foot, which evidently represented cost of the developed lots. While the information on the sale of these lots is not complete, it appears that the proceeds from the sale of the first four lots sold were approximately twice the $0.72 per square foot figure.

As of March 15, 1960 the Land Trust still owned 1,950,426 square feet of usable land.

Hawaii Builders Supply might obtain from the Trustee the business of the Land Trust. Under ordinary principles hereinafter set out, the opportunity to take advantage of the financing offered by the sales agents and building supply company doing business with the Land Trust should have been presented to the remaining shareholders of the Land Trust in order that the Land Trust might avail itself of this opportunity if the remaining shareholders desired.

In attempted refutation of this conclusion, appellants argue that the Land Trust could not have purchased the twelve shares, and cite R.L.H. 1955, § 172-25,[6] relating to purchase by a corporation of its own stock. Even if this statute be deemed applicable to a business trust—a point not decided—there is a line of cases holding that the contention of *ultra vires* does not lie in the mouth of a corporate officer claiming the profits of a transaction for himself. *Cf., Scott* v. *Farmers & Merchants Nat'l Bank,* 97 Tex. 31, 57, 75 S.W. 7, 15; *Memphis & Arkansas City Packet Co.* v. *Agnew,* 132 Tenn. 265, 177 S.W. 949; *Goodhue Farmers' Warehouse Co.* v. *Davis,* 81 Minn. 210, 83 N.W. 531.

It may be argued, however, that the present case differs from those above cited in that (1) it was never contemplated by the parties to the transaction that the purchase would be made by the Land Trust, and it has not been

---

[6] We note appellants' further argument that R.L.H. 1955, § 177-21, limits trustees to certain investments. However, as held in *Yap* v. *Wah Yen Ki Tuk Tsen Nin Hue of Honolulu,* 43 Haw. 37, 40: "* * * R.L.H. 1955, §§ 177-20 to 177-26, contain a permissive list of securities * * *. The sections do not contain restrictions on investments. Restrictions, if any, are found elsewhere."

Section 179-14, as amended by S.L. 1957, c. 269, and in effect at the time involved, is more closely in point. Pursuant to section 340-6, it governs investments by individual trustees. However, we need not discuss section 179-14 as the question is what could have been done with the consent of the remaining shareholders, and nothing in the cited section would have prevented the purchase of the twelve shares for the benefit of the Land Trust with such consent.

shown that the Land Trust's assets and credit were involved in the purchase—it has only been shown that the payments made on the purchase price of the twelve shares eventually came out of commingled funds held by Hawaii Builders Supply and the source of the payments is not clear; (2) the rights of creditors[7] were involved in any purchase of the twelve shares by the Land Trust—from the standpoint of creditors' rights purchase of the twelve shares by the Land Trust, if that had been done, would have been tantamount to a reduction of the capital of the Land Trust, in which situation, under R.L.H. 1955, § 172-52, if deemed applicable, the Land Trust would have been required to retain assets double in value the amount of the debts of the Land Trust; and (3) a director should not be charged with dereliction for failing to transact business in the name of and for the profit of the corporation if by proper effort on his part he could not have obtained the business for the corporation.[8]

We accept these premises for present purposes, but find the record insufficient to show that the twelve shares could not have been bought for the benefit of the Land Trust. So far as appears, on any realistic valuation of the land holdings of the trust the creditors were amply protected even if the assets were reduced by the sum of $102,000, the purchase price of the twelve shares. We must so assume from the condition of affairs found by the Temporary Trustee when he took over, in the absence of evidence that at the time of the purchase of the twelve shares the situation was markedly different. In any event, it has not been

---

[7] Undoubtedly, creditors of a corporation may complain of a purchase by the corporation of its own stock to their injury. 13 Am. Jur., *Corporations*, § 787.

[8] It was so held in *Davis* v. *Pearce*, 30 F.2d 85 (8th Cir.), but the case was one in which the third party refused to deal with the corporation. *Davis* was not a case in which the alleged obstacle to the obtaining of the business by the corporation was based on legal grounds.

shown that Trustee Dean explored the situation, or made any effort to ascertain whether the Land Trust could be given the benefit of the purchase, and when one considers that Trustee Dean had no personal credit and was obtaining financing for the purchase from the sales agents and building supply company who were motivated thereto by the expected profits from the business to be done with the Land Trust, the actions of the Trustee are indefensible.

Since the advantageous financing was made available by the sales agents and building supply company by reason of the placing of trust business with these firms, the profits of the transaction financed in this manner belonged to the trust. This is an application of the rule that when the opportunity to make a profit arises from the position occupied by a fiduciary the profit realized belongs to the principal, at least when the fiduciary has excluded his principal from any chance to enjoy the opportunity coming to the fiduciary in this manner. *Meinhard* v. *Salmon,* 249 N.Y. 458, 164 N.E. 545; *In re Arnay's Estate,* 18 Misc. 2d 266, 187 N.Y.S.2d 782; *Jarrett* v. *Johnson,* 216 Ill. 212, 74 N.E. 756; *cf., Reading* v. *The King,* [1949] 2 K.B. 232, reviewed in 37 Calif. L. Rev. 539, 545. In the present case the financing afforded the Trustee was in the nature of a bonus to the Trustee for placing of the trust business, which is a clear case for imposing a constructive trust. *East Side Mill & Lumber Co.* v. *Dwyer Logging Co.,* 155 Ore. 339, 64 P.2d 89; *Donemar, Inc.* v. *Molloy,* 252 N.Y. 360, 169 N.E. 610; *In re Wechsler's Estate,* 152 Misc. 564, 273 N.Y. Supp. 968; *Carey* v. *Safe Deposit & Trust Co.,* 168 Md. 501, 513, 178 Atl. 242, 247; *Bank of America* v. *Ryan,* 207 Cal. App. 2d 698, 24 Cal. Rptr. 739; *Alexander* v. *Hancock,* 177 Miss. 590, 171 So. 544; *Meyer* v. *Meyer,* 106 Miss. 638, 652, 64 So. 420, 425; *In re Smith,* [1896] 1 Ch. 71; 2 Scott, *Trusts,* § 170.22 (2d ed.); Bogert, *Trusts and Trustees,* § 543 (P) and (Q) (2d ed.); Restatement,

*Trusts,* § 170, comment *o* (2d ed.) ; Restatement, *Restitution,* § 197, comment *c.* See also *Risvold* v. *Gustafson,* 209 Minn. 357, 296 N.W. 411; *Williamson* v. *Krohn,* 66 Fed. 655 (6th Cir.) ; *Troyak* v. *Enos,* 204 F.2d 536 (7th Cir.) ; *Murray* v. *Brown,* 177 Kan. 139, 276 P.2d 344; *Rush* v. *Curtiss-Wright Export Corp.,* 263 App. Div. 69, 31 N.Y.S.2d 550, *aff'd,* 289 N.Y. 562, 43 N.E.2d 712; *Liberty Title & Trust Co.* v. *Plews,* 6 N.J. 28, 77 A.2d 219.

We therefore affirm the constructive trust imposed on the twelve shares, the eighteen lots, and the proceeds thereof.

We now consider the ownership of the one share which, as noted above, belongs either to the Trustee's widow or to his estate. This share hereinafter is referred to at times as the "Dean share." According to the judgment below, this share belongs to the widow as surviving tenant by the entirety but nevertheless is subject to an equitable surcharge for certain items which also were surcharged against the estate of the deceased trustee. We shall consider the surcharges at a later point.

By a stipulation made by all the parties and received as an exhibit at the trial it was agreed:

"2. That just prior to July 20, 1957, there were 16 beneficial shares in the trust property held as follows:

| *Shareholders* | *No. of Shares* |
|---|---|
| William McBurney Dean and Silvia [*sic*] Dean, as tenants by the entirety.......... | 1 |
| *      *      * | *.*" |

As part of this stipulation, which covered many facts, it further was agreed:

"15. That if any conflict exists between the above stipulation and any documents duly admitted in evidence, the documents shall control."

Appellees have taken no cross-appeal but in defense of

642

the surcharges against the Dean share argue that under documents duly admitted in evidence, which it is asserted are controlling, this share belonged to Mr. Dean, was not held in tenancy by the entirety, and now belongs to his estate. Appellees point to the Declaration of Trust and Amended Declarations of Trust made from time to time, some of which show Mr. Dean as owner of one share, while in other instances he does not appear as a shareholder, but in no instance does the holding of a share in tenancy by the entirety appear; a letter to shareholders of June 5, 1956;[9] and the report prepared by the Trustee quoted in part in note 11, *infra,* concerning an assignment of the Dean share for security purposes which was signed only by Mr. Dean.

As to the circumstance that in some documents the Trustee was not listed as a shareholder, this evidently was due to the matter mentioned in note 11, that is, the Trustee thought at one time that he had settled certain claims by endorsing this share. As to the listing of Mr. Dean in some documents as owner of one share without mention of Mrs. Dean or of a tenancy by the entirety,[10] in each such instance all that appears is Mr. Dean's signature purporting to represent one share, along with other shareholders agreeing to the provisions of the Declaration of Trust or an Amended Declaration of Trust. No stock book was proffered. As part of the Declaration of Trust to which appellees assented it was provided that: "As evidence of the ownership of said shares" a numbered negotiable certificate would be issued to each shareholder in a prescribed

9 By this letter to shareholders, dated June 5, 1956, the Trustee distributed a financial statement showing the holders of 16 shares without listing the Trustee as a shareholder.

10 It is to be noted that by the letter agreement of October 23, 1957 the twelve shares, after recoupment of certain sums, were to be transferred "to William McBurney Dean and Sylvia Dean, husband and wife, as Tenants by the Entirety, with full rights of survivorship * * *."

form. This evidently was done, as appears from certificates in the record having to do with the twelve shares. The certificate issued for the Dean share was not produced. The mere fact that Mr. Dean considered his signature sufficient to bind the Dean share when it was assigned as security, or by way of consent to the provisions of the Declaration of Trust, is not controlling. This may have been an error on his part and is not necessarily in conflict with the stipulation as to the ownership of the Dean share. Moreover, no contention was made in the trial court that any of the documents in evidence were in conflict with the stipulation. We have concluded that the surcharges must be sustained, if at all, on some theory consonant with a tenancy by the entirety of the Dean share.

We now review the items surcharged, which consist of:

(1) The listed price of Lot 398 conveyed to Avon Yap, $15,210, less $498 paid thereon, leaving $14,712, the amount surcharged. Lot 398 was one of those allocated, or attempted to be allocated, to the twelve shares. According to the testimony of Avon Yap, he made personal loans to Mr. Dean "in the neighborhood of around $15,000," in addition to the option money, and Lot 398 was payment on the additional monies so advanced.

(2) An easement over land of the trust, conveyed to Avon Yap by the Trustee in July, 1958, for $4,000. Avon Yap testified that he paid this sum to the Trustee, but it was found by the trial court that "no trace can be found of the $4,000 in the amounts paid into the land trust."

(3) The sum of $11,423.53 advanced by Hawaii Builders Supply to Mr. Dean personally, secured by an assignment of the Dean share. The assignment was executed February 22, 1958, but was signed only by Mr. Dean. It recited that the $11,423.53 was paid by Hawaii Builders Supply in behalf of Mr. Dean in satisfaction of claims against Mr. Dean which, according to these recitals, were

secured by this share.[11]  The $11,423.53 has been recouped by Hawaii Builders Supply from the proceeds of the eighteen lots.  By a stipulation approved March 28, 1961, Hawaii Builders Supply has been released by the Land Trust and all other parties.

(4)  The sum of $960, which was paid to the Trustee by the Board of Water Supply for water meters turned over by the Land Trust to the Board on June 10, 1959. For reasons hereinafter stated we deem this surcharge unsupported by the record.  At this point we will consider the other three items.

Item (3) represents a personal loan to Mr. Dean, secured by an assignment of the Dean share signed by Mr. Dean only.   Unlike a joint tenancy,[12] a tenancy by the entirety cannot be severed by an assignment executed by only one of the spouses.  2 Tiffany, *Real Property*, §§ 430, 436 (3d ed.) ; 26 Am. Jur., *Husband and Wife*, § 81.  So far as appears, this loan was unpaid at the time of Mr. Dean's death and was recouped thereafter by Hawaii Builders Supply out of proceeds of the twelve shares without any authority for such recoupment other than an alleged right of set-off which Hawaii Builders Supply could not have sustained since the proceeds of the twelve shares belonged to the Land Trust.   However, Hawaii Builders has been discharged by the Land Trust and all other parties, as previously stated.[13]

---

[11] According to a report dated December 31, 1958, prepared by the Trustee: "Actually the share had been assigned in the first instance as collateral, then endorsed in satisfaction of the claims.  However inasmuch as I wanted the share I thought it better to settle than take a chance on defeating the actions, hence the advance.  As security and protection to Hawaii Builders Supply Company, Ltd., I executed an Assignment of the share to Hawaii Builders Supply Company, Ltd., and also an Assignment of Trustee Commissions to effect repayment."

[12] See *Coelho* v. *Fernandez*, 46 Haw. 578, 584, 384 P.2d 527, 531.

[13] It is to be noted that the stipulation settled claims of Hawaii Builders Supply against the Land Trust in connection with contractual rights of Hawaii Builders Supply upon the sale of further lots.  No implication that the stipulation was disadvantageous to the Land Trust is intended.

It is claimed on behalf of the Land Trust that by reason of the source from which Hawaii Builders Supply secured payment of the loan, the Land Trust has been subrogated to the right of Hawaii Builders Supply to collect this loan. The point is well taken. Restatement, *Restitution,* § 162. However, this argument only sustains the surcharge against the estate of the deceased trustee. It does not sustain the equitable surcharge against the Dean share held by the widow as surviving tenant by the entirety. Even those jurisdictions which sustain a creditor's right to pursue satisfaction of a debt of the husband out of his interest in a tenancy by the entirety recognize that his interest is subject to the possibility that his wife will survive him and take the whole. Annot., 166 A.L.R. 969, 75 A.L.R.2d 1172. In short, in the absence of evidence that steps were taken to collect the loan during the husband's lifetime, we have no occasion to consider whether such collection might have been effected out of the Dean share to any extent. Upon the death of the husband, the case came under the general rule that a wife is not liable for her husband's debts. R.L.H. 1955, § 325-6. Her situation as surviving tenant by the entirety was and is no different from that of any other wife so far as this loan is concerned.

Item (2) represents a surcharge against the Trustee in connection with a transaction as to which the evidence is far from clear. However, we are not convinced that the court below erred in surcharging the amount involved. But for reasons already stated, the court did err in imposing an equitable surcharge on the Dean share, held by the widow as the surviving tenant by the entirety.

Item (1) represents the avails of Lot 398, one of the eighteen lots allocated, or attempted to be allocated, to the twelve shares. Here, a different situation is presented. The Trustee deemed himself beneficial owner of the twelve

shares in tenancy by the entirety with his wife.[14]  In transferring the eighteen lots to Hawaii Builders Supply as trustee, he did so on the theory of effecting a distribution on the twelve shares to himself and his wife in the form of unsold lots.[15]  It appears that the eighteen lots had a market value sufficient to pay therefrom the aliquot share of the costs involved and the purchase price of the twelve shares, and still leave a profit.  This profit, or part of it, was drawn by the Trustee by using one of the eighteen lots to pay his personal debts.  While the Trustee failed to treat the twelve shares as treasury stock, and failed to recognize that he was (with his wife) beneficial owner of only one-fourth of the profits accruing to the twelve shares, nevertheless to some extent the amount drawn from Lot 398 was profit that did belong to the Trustee and his wife as beneficial owners of one-fourth of the profits accruing to the twelve shares.  We shall so regard it under the maxim that: "Equity regards that as done which ought to have been done."[16]  We must take it that the Dean share already has received a distribution out of profits, in the amount of one-fourth of the profits on the eighteen lots over and above the aliquot costs and the purchase price of the twelve shares but not in excess of $14,712.00.  And we are unable to see why the wife, though owner of the Dean share and accordingly a beneficiary of the constructive trust imposed on the eighteen lots under the judgment of

---

[14] See note 1.

[15] As stated in a letter of March 11, 1958, preceding the transfer, which appellants contend went to all shareholders: "* * * [Y]our trustee believes it to be to the advantage of the beneficial owners that Units 2 and 3 of Section A, composed of 24 lots, be prorated among the beneficial owners under Agreements of Sale for as near costs as it is possible to determine at this time * * *."

[16] Quoted from *In re Nelson*, 26 Haw. 809, 816. It is to be noted that this maxim is inapplicable to the other items surcharged, as there is no basis therefor. In the other instances no distribution of profits was made or attempted.

the court, should draw the same amount again.

It may be argued that it has not been shown that the widow herself received any benefit from the distribution so made. The purposes of the loans made by Avon Yap, which were paid off by transfer of Lot 398 to him, do not appear. However, we are satisfied that a husband presumably has the authority to receive the profits of property held with his wife as tenants by the entirety, and whatever right she has to one-half of the amount involved must be asserted against him or his estate, and not by denying his authority to draw the profits. *Cf., Gasner* v. *Pierce,* 286 Pa. 529, 535-36, 134 Atl. 494, 496; *O'Malley* v. *O'Malley,* 272 Pa. 528, 533, 116 Atl. 500, 502; Annot., 27 A.L.R. 184, 264, 51 A.L.R.2d 388, 399.

Accordingly, as distributions are made to the shareholders, such part as is derived from the constructive trust fastened on the eighteen lots, representing profit over and above aliquot costs and the purchase price of the twelve shares, must be withheld from appellant Sylvia Dean up to an amount of $14,712.00. The equitable surcharge which the court below imposed on her share on account of item (1) shall be modified so as to limit the same to the participation of this share in the constructive trust imposed on the eighteen lots in the manner above stated. The surcharge which was imposed against the estate of William M. Dean on account of item (1) shall be modified by deducting therefrom so much as shall be withheld from the widow, Sylvia Dean, pursuant to this paragraph.

Item (4) of the surcharges is, as we have said, unsupported by the record. While appellees offered in evidence a check of the Board of Water Supply to "William M. Dean, Trustee," they at the same time showed by the endorsement on the back of the check that the Trustee, in June, 1959, shortly after the check was received, deposited the check in Bishop National Bank (now First National

Bank) "to the credit of Dowsett Highlands Land Trust."

This evidence was adduced on the second day of the trial at the close of appellees' case. At that time appellees for the first time called upon the Trustee's estate "to show what he did with that money." That gave appellants one afternoon in which to respond to appellees' demand. Appellants put on their case when court resumed the next day, and made no attempt to show what became of the $960 after it was deposited to the credit of the Land Trust. It is our conclusion that they were within their rights. While the administrator with the will annexed undoubtedly could have been called upon to render a complete accounting for the acts of Mr. Dean as Trustee,[17] the case was not handled in that manner. Instead, a master was appointed, and directed "to prepare and make an accounting and report of the status of said Trust and to file said accounting and report with the Temporary Trustee in sufficient time to permit the said Temporary Trustee to file his report," which report the Temporary Trustee also was directed to file. Later, two additional temporary trustees were appointed and directed to file another report. No dissatisfaction with this method of proceeding was expressed by the appellees. The directed reports were filed. Appellees did not seek an order that the estate of the deceased Trustee make an accounting, merely expressing at the trial the view that the $960 item should be surcharged as unaccounted for. No impropriety in connection with this $960 appeared from the reports filed or from the evidence adduced by appellees. The contention that by merely showing the receipt of trust funds appellees had placed on the Trustee's estate the burden of accounting for those funds was not well taken. The court surcharged the $960 item without any foundation therefor.

---

[17] *Estate of Campbell*, 46 Haw. 475, 486-87, 382 P.2d 920, 935.

Next to be considered is the matter of commissions of the Trustee, which were disallowed in the amount accrued subsequent to July 20, 1957 "under the last proper amended declaration of trust dated May 31, 1955 * * *."[18] The amount involved is 5% of the gross proceeds of the sale of the trust property. The expenses incurred herein are in excess of the disallowed commissions, so that notwithstanding the ultimate benefit to the Land Trust from the purchase of the twelve shares, the Land Trust will not have been made whole even if the items surcharged are recovered. The chancellor's discretion as to allowance or disallowance of a trustee's commissions, if there has been a breach of trust, recently was reviewed in *Steiner* v. *Hawaiian Trust Co.*, 47 Haw. 548, 574, 393 P.2d 96, 110-11, and we shall not dwell on the matter. The disallowance of commissions in the present case was well within the scope of the chancellor's discretion.

There remains for consideration the matter of attorneys' fees. Appellees were allowed attorneys' fees payable out of the funds of the Land Trust. Appellants contend that no fees were allowable; that the amount allowed was excessive; and that the attorney for appellees having served as a temporary trustee as well was not entitled to fees in both capacities.

Under the principles last set out in *Estate of Campbell*, 46 Haw. 475, 522, 382 P.2d 920, 953, 47 Haw. 216, 385 P.2d 828, counsel fees clearly were allowable.[19] In

---

[18] The court canceled the amended declaration of trust of January 6, 1958, subject to amendment or ratification by the proper shareholders. This 1958 amendment was consented to only by Hawaii Builders Supply. The court's action was called for by its conclusion that Hawaii Builders Supply was constructive trustee of the twelve shares. It was as holder of the twelve shares that it purported to consent to the amendment.

[19] "* * * [W]hen litigation is in advancement of, and not in opposition to, the interests of all the beneficiaries of a trust, counsel fees may be allowed to litigants out of the estate." *Estate of Campbell*, 46 Haw at 522, 382 P.2d at 953.

view of the services rendered and the benefits accomplished for the Land Trust, we do not find the amount allowed excessive. As to the circumstance that appellees' attorney also served as a temporary trustee, this was approved by the widow, who chiefly is concerned, and in any event, no conflict of interest is involved as in both capacities the services rendered were in behalf of the Land Trust as a whole. In this jurisdiction there is no rule against a trustee receiving both his fees as such and attorney's fees. See *Estate of Maikai,* 3 Haw. 522; *Guardianship of Humeku,* 15 Haw. 394; *Estate of Ena,* 24 Haw. 414, 417; *Guardianship of Trask,* 27 Haw. 343, 349.

The chancellor disallowed any compensation out of the Land Trust for services of appellants' attorneys. No benefit to the Land Trust resulted from these services. It is contended that the securing of a determination of the ownership of the twelve shares in itself was a benefit to the Land Trust. The material point, however, is that the contentions of appellants were antagonistic to the interests of the trust as a whole. It was their efforts to retain what the Trustee had wrongfully diverted that caused the litigation. This is not a case of an ambiguity to be resolved at the expense of the trust, including reasonable attorneys' fees for both sides. *Cf., Estate of Brown,* 24 Haw. 573.

In summary, paragraphs 1 and 2 of the judgment are affirmed. Paragraph 3 is affirmed with the addition of the proviso that, as distributions are made to the shareholders, such part as is derived from the constructive trust fastened on the eighteen lots, representing profit over and above aliquot costs and the purchase price of the twelve shares, must be withheld from Sylvia Dean up to an amount of $14,712.00.

Paragraph 4 of the judgment is affirmed. Paragraph 5 is modified by deleting the words "which shall be a specific equitable charge upon the one beneficial share in the Land

Trust now owned by Sylvia Dean by virtue of the death of Mr. Dean"; by deleting item c in the amount of $960 (reviewed herein as item (4)); and by modifying item a (reviewed herein as item (1)) to read:

"a. The listed price, $15,210 of lot 398 conveyed to Avon Yap, less $498 paid thereon, and less such sum as shall be withheld from Sylvia Dean pursuant to the proviso of paragraph 3........not more than $14,712.00."

The total of the surcharged items shall be modified to read:

"not more than $30,135.53."

Paragraphs 6 to 11 inclusive of the judgment are affirmed insofar as they were challenged in this court.

Remanded for the entry of a modified judgment in conformity with this opinion.

*Masaji Marumoto* and *Ton Seek Pai* (*Ton Seek Pai* on the briefs) for appellants.

*Herbert Y. C. Choy* (*Fong, Miho, Choy & Robinson* of counsel) for appellees.