The ESTATE OF Chester P. LAMPERT, Through its Personal Representative, Jan THURSTON, Appellant and, Cross–Appellee,

v.

The ESTATE OF Helen Thelma LAMPERT, Through its Personal Representative, Grace STAUFFER, Appellee and Cross–Appellant.

Nos. S–6233, S–6234.

Supreme Court of Alaska.

May 26, 1995.

Mark E. Ashburn, Ashburn & Mason, Anchorage, for appellant and cross-appellee.

R.N. Sutliff, Anchorage, for appellee and cross-appellant Estate of Helen Thelma Lampert, through its Personal Representative, Grace Stauffer.

Thomas P. Owens III, Burr, Pease & Kurtz, Anchorage, for appellee Grace E. Stauffer, Individually.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

### OPINION

MOORE, Chief Justice.

## I. INTRODUCTION

This case arises from the probate of the estates of Chester and Helen Lampert, husband and wife. The main issues in dispute are the validity of a postnuptial property agreement and the ownership rights to a condominium located in Hawaii. The lower court entered summary judgment in favor of the Estate of Helen Lampert, and after trial, awarded Helen's estate damages for lost use of property. Each estate appeals. We affirm the decision in part and reverse in part.

## II. FACTS AND PROCEEDINGS

Chester and Helen Lampert were in their late fifties when they married in 1965. Each had adult children by prior marriages.

Five years into their marriage, with the assistance of an attorney, the Lamperts entered into a postnuptial property agreement. Under the agreement, entitled the "Joint Submarital Agreement Waiving Rights to Receive One–Third of Net Estate of Spouse," the couple waived their statutory rights to take a one-third elective share of the other's estate, released all claims for dower, curtesy, or similar statutory rights of the surviving spouse, and pledged not to contest the other's will. Chester promised to deed their Anchorage home (the "Karluk residence"), together with its furniture and fixtures, to Helen, and Helen promised to provide Chester with a life estate in this property through her will. Chester further promised to arrange for Helen to receive $2,000 per month for the period which she might outlive him.

Pursuant to this agreement, Chester immediately executed a warranty deed conveying the Karluk residence, its fixtures, and furniture to Helen. Chester also executed a will, which established a trust to provide Helen with the agreed upon cash payments.

Helen executed her own will, in which she granted Chester a life estate in the Karluk property.

Several years later, in 1980, the Lamperts again met with an attorney to discuss estate planning. The two were advised that Chester would achieve significant estate tax savings if he were to commence an annual gift program during his lifetime. The discussion focused upon a condominium which Helen and Chester owned in a tenancy by the entirety with full rights of survivorship. The meeting resulted in Chester executing three quitclaim deeds to convey "his right, title, and interest" in the Hawaii condo to Helen's daughter, Grace Stauffer.[1] Helen signed none of these three deeds, and Stauffer paid nothing for the property.

During this period, on two occasions Helen and Chester formally renewed their commitment to the terms of the "Joint Submarital Agreement." In December 1980, the Lamperts amended the agreement to increase the monthly payments due Helen to $5,000. The remaining terms were expressly "reconfirm[ed]." Again, in 1981 the Lamperts revised their wills. The provisions fully conformed with the couple's estate plan as embodied in the amended postnuptial agreement. Helen additionally certified at the conclusion of Chester's will that she "hereby reaffirm[ed]" the provisions of the couple's marital estate agreement.

Despite these assurances, in September 1988, Helen secretly visited an attorney and modified her estate plan.[2] Helen executed a codicil to her will which stated that with regards to the Lamperts' postnuptial property agreement, "my legal rights were never adequately explained to me at the time of the execution of those documents, and . . . the provisions applicable to me under my spouse's Will and Trust do not meet his obligations to me." The codicil deleted Chester's life estate in the Karluk furniture, and an amended trust revoked his life estate in the residence itself. Helen never told Chester about these events. Less than three months later, Helen died.

Grace Stauffer was appointed the personal representative of the Estate of Helen Lampert. After Helen's death, the estate formally notified Chester that his life estate in the Karluk residence, fixtures, and furniture had been revoked. Chester did not vacate the property, however, and lived in the home until his death which followed several months later. Meanwhile, a title report prepared for the Hawaii property after Helen's death indicated that despite the three quitclaim deeds to Stauffer, Chester might in fact be the condo's true owner. Despite this revelation, Stauffer retained actual control over the Hawaii property.

A few months before his death in August 1989, Chester brought suit against the Estate of Helen Lampert. Rather than seeking to *enforce* the couple's postnuptial agreement, Chester alleged that Helen's secret alteration of her estate plan entitled him to rescind their contract. Chester accordingly sought restitution of his consideration, title in fee simple to the Karluk residence, and made an election for one-third of Helen's estate. In a separate count, Chester sought possession of the Hawaii condo, under a theory that title passed to him as survivor and that previous attempts to unilaterally sever his interest in the property were legally ineffective and void.

Shortly after Chester's death, the Estate of Helen Lampert filed and served Chester's attorney with a "Statement of Death of Party." Although Chester's estate failed to move the court to substitute a party within ninety days of the notice as required by Alaska Civil Rule 25(a), the court ultimately ruled that the delay constituted "excusable neglect."

Following these events, the Estate of Helen Lampert filed a claim against the Estate

---

1. The conveyance was undertaken in two steps, one at the end of December 1980 and one at the beginning of January 1981, to take advantage of a $10,000 annual gift tax exclusion. The third conveyance, a deed of correction, was necessary to remedy a problem with the wording of the two previous grants.

2. Helen's daughter was present at this meeting, but Stauffer denies any active role in the events. She explains that her mother could no longer drive, and she simply assisted in getting her to the appointment.

of Chester Lampert, based upon the refusal of Chester's heirs to vacate the Karluk residence. The claim sought possession of the Karluk residence and damages for lost use of the property for the period following Chester's death. Stauffer also initiated an individual claim against the Estate of Chester Lampert, requesting that title to the Hawaii condo be quieted in her. Finally, Chester's estate counterclaimed against Stauffer, demanding compensation for lost rental income based upon lost use of the Hawaii property. The entire matter was consolidated, and each estate moved for summary judgment.

In addressing the continued effect of the Lamperts' postnuptial agreement, the lower court commented on the "extreme nature of rescission" and noted that the remedy is proper only in cases involving a material breach of contract. The court was unconvinced that Helen's actions amounted to a material breach since "the breach did not defeat the object of the parties." The court reasoned that because Chester was not ousted from the Karluk residence following Helen's death, Chester, in effect, received the promised life estate. The court additionally stated that based upon the circumstances, Chester received all of the other benefits that he bargained for under the contract.[3] Given the conclusion that Helen's actions did not amount to a total failure of consideration, the court refused to rescind the twenty-year-old warranty deed executed by Chester or allow him to elect a one-third spousal share of Helen's estate.

The court went on to address the ownership of the Hawaii property. The court first recognized that under governing Hawaii law, a spouse may not unilaterally convey an interest in property that is held as tenants by the entirety.[4] In response to Stauffer's initial argument that title should nevertheless be quieted in her, the court refused to find that Chester acted as Helen's agent in the gift transfer to Stauffer. The court explained that the agency exception permitting a conveyance by one spouse in a tenancy by the entirety has not been formally recognized in Hawaii. The court was persuaded by Stauffer's alternative argument, however, that under both Alaska and Hawaii law, the equitable doctrine of quasi-estoppel bars Chester and his heirs from arguing that the earlier transfer was ineffective. Considering the totality of the circumstances, the court concluded that the Estate of Chester Lampert was estopped from denying Stauffer's ownership of the Hawaii property.

The parties conducted a bench trial on the remaining question of damages. The court awarded the Estate of Helen Lampert $19,615.59 for lost use of the Karluk residence.

An appeal and cross-appeal on behalf of each estate followed.

## III. DISCUSSION

### A. Failure to Timely Move for Substitution

Before considering the merits, we briefly address a claim of procedural error advanced by the Estate of Helen Lampert. Helen's estate argues that Chester's claims should have been dismissed with prejudice after his death when his estate failed to timely move for substitution of parties. Helen's estate cites Alaska Civil Rule 25(a), which provides that once formal notice is filed that a party to litigation has died, a motion to substitute parties must be made within ninety days or "the action shall be dismissed as to the deceased party." In the present case, after Helen's estate filed the "Statement of Death of Party," 148 days elapsed with no motion to substitute.

The lower court initially granted the estate's motion to dismiss with prejudice all actions brought by Chester Lampert. The court entertained a motion to reconsider, however, and after a hearing before a probate master, vacated the dismissal and granted the motion to substitute. In modifying its decision, the court relied upon Alaska Civil

---

3. The court noted that since Helen died first, she could not claim the monthly cash maintenance agreed to in the postnuptial agreement, nor would she ever claim an elective spousal share of Chester's estate.

4. *Traders Travel Int'l, Inc. v. Howser*, 69 Haw. 609, 753 P.2d 244, 246 (1988); *Sawada v. Endo*, 57 Haw. 608, 561 P.2d 1291, 1295–96 (1977); *In re Dean's Trust*, 47 Haw. 629, 394 P.2d 432, 440 (1964).

Rule 6(b), which permits the court to enlarge the time specified for a filing upon a showing of "excusable neglect."

We have held that a court's authority to enlarge the time allowable for an act pursuant to Rule 6(b) is a function addressed to the sound discretion of the trial court. *State v. 1.163 Acres, More or Less,* 449 P.2d 776, 779 (Alaska 1968). The court apparently considered several reasons offered by Chester's estate to justify the delay in moving to substitute. The estate explained that Chester's attorney did not initially appreciate the significance of the "Statement of Death of Party" filing because the form utilized by Helen's estate contained no reference to Rule 25(a). In addition, when co-counsel was retained for the estate, Chester's attorney neglected to forward the "Statement of Death" along with the other files. The estate asserted that these oversights were not undertaken in bad faith, and it contended that the Estate of Helen Lampert was on notice that Chester's personal representatives were actively pursuing the estate's claims because before the expiration of ninety days, the estate's new attorneys made an entry of appearance.

Helen's estate urges us to reject these excuses, citing a need for speedy probate and alleging that prejudice was visited upon Helen's estate by the delay. Helen's estate explains that the heirs are generally of advanced age and ill health, and that the unnecessary delay in probate caused stress and increased the time during which the heirs were deprived of enjoying their mother's estate.

Upon review of the record, we do not believe that the trial court was clearly mistaken in finding that the Estate of Chester Lampert showed excusable neglect in failing to timely move for substitution. The probate master characterized the delay in moving for substitution as "neglectful," but noted that Helen's estate was on notice of the claim and that she was not convinced that undue prejudice would result from leniency. The superior court did not clearly err in adopting the master's recommendations. We therefore affirm the decision granting the motions for enlargement of time and for substitution of parties.

## B. *Standard of Review*

The remaining issues share a common procedural posture: the Estate of Chester Lampert appeals from the entry of summary judgment. In reviewing a grant of summary judgment, we must determine whether a genuine issue of material fact exists and, if not, whether one party is entitled to judgment as a matter of law. *Newton v. Magill,* 872 P.2d 1213, 1215 (Alaska 1994). In reviewing the lower court's findings of fact based upon a non-testimonial record, this court is free to reach an independent conclusion. When reviewing questions of law, this court applies its independent judgment. *Summers v. Hagen,* 852 P.2d 1165, 1169 (Alaska 1993).

## C. *The Postnuptial Agreement*

The Estate of Chester Lampert appeals the entry of summary judgment refusing to rescind the couple's postnuptial agreement. We note at the outset that estate-planning agreements of the type used here are valid contracts. *See* AS 13.11.085 (providing that married couples may waive all rights of the surviving spouse by written contract executed before or after marriage); *Brooks v. Brooks,* 733 P.2d 1044, 1048 n. 4. (Alaska 1987) (observing that prenuptial agreements made in contemplation of death "since the time of Shakespeare" have been considered presumptively valid because they are seen as "conducive to marital tranquility and preventing unnecessary litigation"); *McBain v. Pratt,* 514 P.2d 823, 826 (Alaska 1973) (holding as enforceable a contract to make a specific devise or bequest). The usual rules of contract construction apply. *See, e.g., In re Marriage of Ellinwood,* 59 Or.App. 536, 651 P.2d 190, 192–93 (Or.App.1982); *Lund v. Lund,* 849 P.2d 731, 739 (Wyo.1993).

In *McBain v. Pratt,* we stated that a contract to make a bequest or devise requires the promisor to execute, during his lifetime, a will in satisfaction of the contractual obligation. 514 P.2d at 826. Although any will so made remains entirely revocable by the testator, if at the moment of death the promisor has not made the agreed testamentary

gift, a breach of contract occurs. *Id.* The question presented by the case at bar requires us to assess whether, by secretly altering her estate plan, Helen materially breached the Lamperts' postnuptial contract. If Helen's actions were so material that they destroyed the "essence" of the bargain, under contract law, Chester's estate is entitled to rescission and restitution of benefits conferred. *See, e.g.,* Restatement (Second) of Contracts §§ 372, 373 (1981) (providing that in instances of total breach of contract, the injured party may elect restitution to recover money or property as an alternative to expectation damages); 5 Arthur L. Corbin, *Corbin on Contracts* § 1104, at 562 (1964) (stating that the promisee is entitled to rescission and restitution when breach is total and goes to the contract's "essence").

States which have addressed whether to set aside a nuptial agreement for material non-performance have essentially required a showing of total breach. The lower court relied upon *In re Estate of Johnson,* 202 Kan. 684, 452 P.2d 286 (1969), a Kansas case stating that the right to rescission is not justified absent *total* failure of consideration:

> To warrant rescission, the breach must be material and the failure to perform so substantial as to defeat the object of the parties in making the agreement. A breach which goes to only a part of the consideration, which is incidental and subordinate to the main purpose of a contract, does not warrant rescission.

*Id.* 452 P.2d at 292; *see also Estate of Gillilan,* 406 N.E.2d 981, 990 (Ind.App.1980) (substantial breach goes to "material and vital" aspect of the contract and substantially defeats contract's purpose); *Brees v. Cramer,* 322 Md. 214, 586 A.2d 1284, 1288 (1991) ("breach of a covenant in a [nuptial] agreement does not, *ipso facto,* excuse performance of another covenant by the other party"). A Pennsylvania case elaborates:

> The question is whether [the variance from the contract] disturbed the essential fairness of the agreement that had been reached or changed the bargain to an extent that it can be said that to enforce the agreement would be tantamount to requir-

ing the surviving spouse to be bound by an agreement to which she did not agree.

*In re Estate of Cummings,* 493 Pa. 11, 425 A.2d 340, 342–43 (1981).

█ Although we find that the lower court applied the correct standard to this dispute, we disagree with its conclusion that Helen's non-performance "did not defeat the object of the parties." The Lamperts' postnuptial contract was in place for approximately eighteen years and twice reaffirmed before Helen altered her estate plan. The agreement simply provided that the surviving spouse would waive the one-third elective statutory share and other significant rights of the surviving spouse in exchange for certain specific benefits. If Helen were the first to die, her only obligation was to leave her husband a life estate in the Karluk residence, its fixtures, and furniture. She died without satisfying this key term.

Based upon the structure of the entire agreement, Helen's obligation to leave a will in compliance with the Lamperts' postnuptial contract cannot be termed "incidental and subordinate to the main purpose of [the] contract." *In re Estate of Johnson,* 452 P.2d at 292. The Lamperts' postnuptial agreement contained very few provisions, and, with the exception of Chester's promise to immediately grant Helen title to the Karluk residence, every term was conditioned upon the couple's order of death. Because the estate plan was intended to respond to various contingencies with discrete grants of cash or property, it is evident to us that those terms of the contract cannot be severed from one another. Helen's promise to grant Chester a life estate in the couple's home was a pivotal portion of the consideration given in formulation of the total agreement. We therefore conclude that by failing to cure her secret revocation of Chester's ownership rights to the home and its contents, and by explicitly expressing her desire to avoid the contract's terms, Helen disturbed the "essence" of the Lampert's postnuptial estate plan.

The fact that Helen's heirs did not bring an action to oust Chester from the Karluk residence has no relevance to this determination. The lower court relied upon this factor,

observing that Chester "in effect had a life estate until his own death." What Chester bargained for under the "Joint Submarital Agreement," however, was title to a legal life estate in the property. As soon as Helen died without satisfying this obligation, she was in total breach of contract.

Given that Helen unilaterally unraveled the Lamperts' agreed-upon estate plan, we hold that Chester's estate may treat the contract as a nullity. His duty to forbear from claiming the rights of the surviving spouse is therefore discharged, and his estate is entitled to be restored "to as good a position as was occupied by him before the contract was made." 5 Corbin, *supra,* § 1102, at 548. Under the circumstances, restitution requires the Estate of Helen Lampert to return the specific benefits which Chester conferred in furtherance of the contract. Title to the Karluk residence shall therefore be restored to Chester's estate.[5]

### D. *Ownership of the Hawaii Condominium*

#### 1. *Choice of law*

The Estate of Chester Lampert also appeals the entry of summary judgment estopping Chester's estate from denying Stauffer's ownership of the Hawaii condo. As a threshold matter, this issue presents a choice of law question. We adhere to the rule that matters pertaining to the validity of conveyances of real property are governed by the law of the situs of the property. *E.g., Sylvester v. Sylvester,* 723 P.2d 1253, 1257 (Alaska 1986) (looking to Hawaii law to assess whether a conveyance of Hawaii property was fraudulent); *Hinchee v. Security Nat'l*

*Bank,* 624 P.2d 821, 822 & n. 1 (Alaska 1981) (applying Hawaii law to determine whether one spouse may unilaterally sell or mortgage property owned as tenants by the entirety). Following this line of authority, the law of Hawaii governs this dispute.

#### 2. *Quasi-estoppel*

The parties agree that looking at the face of the three quitclaim conveyances of the Hawaii property, no legal interest was successfully transferred to Stauffer. The general rule in Hawaii and many other states is that real property held in a tenancy by the entirety is not subject to levy and execution for the debt of one spouse and may not be unilaterally sold or alienated. *See, e.g., Sawada v. Endo,* 57 Haw. 608, 561 P.2d 1291, 1295–96 (Haw.1977).[6] Strict application of this rule in the present case necessitates that in order to affirm the lower court's holding divesting ownership from Chester's estate, an exception to this general rule must be satisfied.

Stauffer raised two theories below to support her retention of the property: agency and quasi-estoppel. The lower court rejected the first argument, reasoning that Hawaii has not yet recognized the agency exception, which in some states allows entireties property to be conveyed by one spouse when acting as the other's agent.[7] The court was persuaded by the second argument, however, and concluded that the equitable doctrine of quasi-estoppel forbids Chester or his estate from taking a position contrary to Chester's original belief that the gift transfer was fully effective. We agree with the lower court's

---

**5.** The lower court cited *Easterling v. Ferris,* 651 P.2d 677 (Okla.1982), for the proposition that "[t]he cancellation of a deed is an exertion of the most extraordinary power of a court of equity. The power ought not be exercised except in a clear and exceptional case." *Id.* at 682. In our opinion, the facts of this case merit such relief. As the *Easterling* court noted, "[r]escission or cancellation of a deed may be ordered when that which was undertaken to be performed ... was 'so essentially a part of the bargain that the failure of it must be considered as destroying or vitiating the entire consideration of the contract or so indispensable a part of what the parties bargained for that the contract would not have been made without it.'" *Id.* (citation omitted).

**6.** Chester could not have successfully transferred even a one-half interest in the condo: "Neither husband nor wife has a separate divisible interest in the property held by the entirety that can be conveyed or reached by execution." *Sawada,* 561 P.2d at 1295.

**7.** *See Murray v. Sullivan,* 376 So.2d 886, 889 (Fla.App.1979) (noting the possibility of a unilateral transfer when one spouse, with full knowledge of the facts, designates the other as his or her agent, the transfer does not adversely affect the interest of the spouse, and it occurs with his or her assent).

resolution of the case on quasi-estoppel grounds, and as such, we need not reach the argument based upon agency.

In *Godoy v. County of Hawaii*, 44 Haw. 312, 354 P.2d 78 (1960), the Hawaii Supreme Court referred to quasi-estoppel as a "species of equitable estoppel ... which has its basis in election, waiver, acquiescence, or even acceptance of benefits and which precludes a party from asserting to another's disadvantage, a right inconsistent with a position previously taken by him."[8]  *Id.* 354 P.2d at 82.  At its root, the doctrine is based on the maxim that "one cannot blow both hot and cold."  *Id.* at 82; *see also University of Haw. Professional Assembly v. University of Haw.*, 66 Haw. 214, 659 P.2d 720, 726 (Haw. 1983).

Case law demonstrates that the doctrine of quasi-estoppel is not rigidly applied in Hawaii.  *Godoy* provides the following guidance:

> [Quasi-estoppel] is based upon the broad equitable principle which courts recognize, that a person, with *full knowledge of the facts*, shall not be permitted to act in a manner *inconsistent with his former position or conduct* to the injury of another. To constitute this sort of estoppel the act of the party against whom the estoppel is sought must have *gained some advantage for himself or produced some disadvantage to another*; or the person invoking the estoppel must have been induced to change his position, or by reason thereof the rights of other parties must have intervened.

354 P.2d at 82–83 (emphasis added).  Like any equitable theory, the doctrine offers flexibility: "Estoppel by any name is based primarily on considerations of justice and fair play...."  *University of Haw.*, 659 P.2d at 726.

When these maxims are applied to the present case, several factors indicate that it would be inequitable to allow Chester to reverse his position, through his estate, at this late date.  First, as Stauffer points out, Chester possessed full knowledge of the facts when he originally gifted over his interest in the Hawaii condo.  Chester's estate does not claim that Chester was mistaken as to the identity of the property or about the fact that he intended to transfer it to Stauffer.  In addition, Chester was advised by an attorney in the transaction, and he executed not one but three deeds to Stauffer over the course of several months.  From his actions, we conclude that Chester's desire to transfer the property to Stauffer was informed and purposeful.

Second, Chester's estate has now taken a position directly inconsistent with the original view that Stauffer owned Chester's interest in the condo.  Chester's estate now relies upon an unclear title report and Hawaii law which existed at the time of the transfer, and contends that the original grant to Stauffer was wholly ineffective.

Third, this change in position has worked to Stauffer's clear disadvantage.[9]  As Stauffer explains, Chester fully acquiesced in her ownership of the condo for approximately eight years before filing the claim for title.  Although it does not appear that Stauffer uses the condo as a home, the record demonstrates that she has generated rental income from the property.  Stauffer is now in her late sixties and apparently living on a fixed

---

8.  By contrast, traditional equitable estoppel "requires proof that one person *wilfully* caused another person to erroneously believe a certain state of things, and that [the] person reasonably relied on this erroneous belief to his or her detriment."  *Maria v. Freitas*, 73 Haw. 266, 832 P.2d 259, 264 (Haw.1992) (emphasis added).

9.  Chester's estate contends that Chester gained no *advantage* from his change in position.  The estate emphasizes that Stauffer paid nothing for the property.  In this context, the lower court found that the transfer's main purpose was to shelter Chester from excessive estate tax.  Because estate tax savings is not realized until

death, however, at the time Chester changed his position and attempted to renege on the gift, the estate argues that Chester had not yet received any tangible financial advantage from the transfer.

We do not find these arguments dispositive.  Under Hawaii's application of quasi-estoppel, it is not necessary for the estopped party to have gained any tangible advantage from the transaction.  Rather, it is sufficient to show that the party seeking estoppel would suffer a distinct *disadvantage* from the change in position.  *See University of Haw.*, 659 P.2d at 725; *Godoy*, 354 P.2d at 82–83.

income. Given the circumstances, we believe the record demonstrates that in changing positions, Chester has "produced some disadvantage to another." [10]

Finally, other basic equitable considerations indicate that estopping Chester's estate from asserting ownership in the Hawaii property would serve the notions of "justice and fair play." Stauffer was Chester's stepdaughter. Because the Lamperts mapped out their estate plan to give a very limited inheritance to the surviving spouse, unless her mother were to survive Chester, or barring a specific devise from her stepfather, Stauffer stood a very indefinite chance of ever inheriting a share in the Hawaii property. The idea for the 1980 inter vivos gift transfer to Stauffer was in fact entirely initiated and encouraged by Chester and his attorney. Thus, any disadvantage that Stauffer would now suffer from losing possession of the Hawaii property would be directly traceable to Chester's actions, and less so to her own. [11]

We conclude that under the doctrine of quasi-estoppel as applied in Hawaii, fairness dictates that Chester's estate may not now gain from the imperfect conveyance which Chester originally intended to be effective. We therefore affirm the entry of summary judgment equitably estopping Chester's heirs from denying Stauffer's ownership of the Hawaii property and quieting title in her.

## IV. CONCLUSION

The lower court properly granted the untimely motion for substitution made by the Estate of Chester Lampert and correctly resolved the dispute concerning the Hawaii property. However, the lower court erred in refusing to rescind the Lamperts' postnuptial property agreement and in compensating the Estate of Helen Lampert for lost use of the Karluk residence.

AFFIRMED IN PART, REVERSED IN PART and REMANDED for entry of relief consistent with this opinion.

---

**10.** As further indication of disadvantage caused by Chester's change in position, Stauffer notes that for several years before their deaths, she provided extensive care-giving services to Chester and Helen. We ascribe no weight to this evidence. Whether these services contributed to Chester's motivation to gift the condo to Stauffer remains unclear.

**11.** We reject an argument made by Chester's estate that because Stauffer participated in the meeting during which Helen modified her estate plan, Stauffer has "unclean hands" and therefore cannot be accorded equitable relief. Chester's estate presents no evidence tending to show that Stauffer actively encouraged her mother to abandon the Lamperts' postnuptial agreement. Furthermore, even if there were sufficient evidence to demonstrate this fact, the parties' disputes over the Lamperts' postnuptial agreement and the ownership of the Hawaii condo are not factually related. *See Shinn v. Edwin Yee, Ltd.,* 57 Haw. 215, 553 P.2d 733, 744 (Haw.1976) (holding that "where the plaintiff's claim has no direct connection with the alleged misconduct ... the doctrine of 'unclean hands' will not be invoked to defeat his claim").